UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 06-61288-CIV-COHN/Snow

JEFFREY COLLIS,

        Plaintiff,

   vs.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

        Defendant.
_____/

## REPORT AND RECOMMENDATION

This cause is before the Court on the plaintiff's complaint seeking judicial review of a final decision of the Social Security Administration denying the plaintiff's application for disability benefits. The complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 401, et. seq., and was referred to United States Magistrate Judge Lurana S. Snow for report and recommendation.

### I. PROCEDURAL HISTORY

The plaintiff filed an application for disability benefits on May 20, 2004, alleging disability since January 15, 2003, as a result of attention deficit hyperactivity disorder (ADHD), bipolar disorder and narcissism. The application was denied initially and upon reconsideration. The plaintiff then requested a hearing which was held before Administrative Law Judge

J. Robert Brown on November 15, 2005. The Administrative Law Judge found that the plaintiff was not disabled within the meaning of the Social Security Act. The Appeals Council denied the plaintiff's request for review on June 30, 2006. The plaintiff then filed this action seeking judicial review of the decision of the Commissioner.

II. FACTS

The plaintiff was born on April 16, 1973, and has a high school equivalent education. His past relevant work was as a mechanic and an employee in various businesses. The plaintiff has not engaged in any substantial gainful activity since January 15, 2003. The medical record reveals that the plaintiff presented to Nova Southeastern University's Community Mental Health Center on November 16, 2001, with symptoms of ADHD. The plaintiff reported attention and concentration problems, as well as anger, impulsivity, marital problems and an inability to experience the full range of emotions. The plaintiff denied suffering from depression and he did not appear to suffer from mania. His initial global assessment of functioning (GAF) was 60. (R:125, 129-30)

The plaintiff was provided individual weekly therapy, focusing on improving the plaintiff's memory and communication skills. He also was taught to recognize his anger and manage it more efficiently. The plaintiff reported an increased ability to concentrate, and stated that he had become much more goal-oriented and had begun to have plans for his future. (R:125)

The treatment summary reflects that therapy was terminated on June 5, 2002, because the plaintiff had not contacted his therapist, nor replied to letters and phone calls from her since April 12, 2002. The plaintiff had stopped taking Risperdal, which had been prescribed for him by a private psychiatrist. Diagnosis was Attention-Deficit/Hyperactivity Disorder, Combined Type and a GAF of 70. (R:125-26)

On March 18, 2004, Maria Uy, M.D., saw the plaintiff for a medication check. Dr. Uy reported that the plaintiff had just been seen for a psychiatric evaluations, but Dr. Uy did not have the report available to her. Dr. Uy stated that the plaintiff "apparently has ADHD and what sounds like Bipolar Disorder." (R:106) The plaintiff told the doctor that Wellbutrin made him more irritable, but he consented to starting Depakote and Adderall. Id.

Dr. Uy noted that the plaintiff was groomed, had good eye contact, and his speech was within normal limits. He was cooperative and friendly, affect was full and stable and mood was euthymic. The plaintiff had no psychotic symptoms, suicidal or homicidal thoughts, and his insight and judgment were adequate. She diagnosed Bipolar Disorder, Not Otherwise Specified and Attention-Deficit/Hyperactivity Disorder, Combined Type. Dr. Uy instructed the plaintiff to return in one month. Id.

3

On May 7, 2004, the plaintiff was evaluated at Making A Difference for You, Inc., in Miramar, Florida.  The evaluator (a medical doctor whose signature is illegible) noted that the plaintiff's thought content and fund of knowledge were within normal limits, attention,  concentration and insight were fair, intellect was average and judgment was intact.  Diagnosis was ADHD, and the plaintiff was to continue taking Depakote and Adderall. (R:94-96)

The plaintiff began treatment at Compass Health Systems on July 21, 2004.  His initial evaluation indicated that the plaintiff suffered from ADHD, Combined Type, and was stabilized on his current medications.  The evaluator found that the plaintiff's appearance and affect were appropriate, and that activity, speech, mood, symptoms, anxiety level, thought process and thought content were all were normal.  The plaintiff displayed no suicidal ideation. He was alert, and his orientation, recent and remote memory, concentration/attention span (with medication), language, information and intelligence, insight/judgment and gait/station were normal.  The plaintiff's assets included family/social support, coping skills and frustration tolerance, with finances his only liability.  (R:121-24)

On September 1, 2004, a state agency non-examining psychologist, M. I. Figueredo, Ph.D., completed a Psychiatric

4

Review Technique Form pertaining to the plaintiff.  Dr. Figueredo found that the plaintiff suffered from A.D.H.D., a medically determinable impairment, as well as bipolar disorder by history and alcohol dependence.  In terms of the plaintiff's functional limitations, Dr. Figueredo found that the plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace and no episodes of decompensation.  Dr. Figueredo concluded that the plaintiff's impairments were "not severe" for purposes of disability determination. (R:98-103)

A second non-examining state agency psychologist, M. De Cubas, PhD., completed a Psychiatric Review Technique Form on November 1, 2004.  Dr. De Cubas agreed that the plaintiff suffered from A.D.H.D., a medically determinable impairment.  He also found that the plaintiff suffered from bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes.  (R:107-09)

Dr. De Cubas agreed with Dr. Figueredo that the plaintiff had only mild restriction of activities of daily living, mild difficulties in maintaining social functioning and no episodes of decompensation.  However, Dr. De Cubas believed that the plaintiff had moderate difficulties in maintaining concentration, persistence

or pace. Dr. De Cubas' notes reflect that the plaintiff reportedly had stopped working because he could not concentrate. Dr. De Cubas found that the plaintiff's memory and concentration were fair, insight and judgment were adequate and no psychosis was present. The plaintiff was able to manage basic activities of daily living, reported no significant social problems, was able to understand instructions and carry them out, and had an adequate ability to follow a schedule. (R:110-12)

Also on November 1, 2004, Dr. De Cubas also completed a Mental Residual Functional Capacity Assessment of the plaintiff. He found that the plaintiff had no significant limitations in the following abilities: remembering locations and work-like procedures; understanding and remembering very short and simple instructions; carrying out very simple instructions; performing activities within a schedule, maintaining regular attendance and being punctual within customary tolerances; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being distracted by them; making simple work-related decisions; interacting appropriately with the general public; asking simple questions or requesting assistance; getting along with coworkers or peers without distracting them or exhibiting behavior extremes; maintaining socially appropriate behavior and adhering to basic standards of neatness and

6

cleanliness; being aware of normal hazards and taking appropriate precautions, and traveling in unfamiliar places. (R:113-14)

Dr. De Cubas opined that the plaintiff had moderate limitations in the following abilities: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods; responding appropriately to changes in the work setting, and setting realistic goals or making plans independent of others. The plaintiff had no marked limitations. Id.

Dr. De Cubas' functional capacity assessment of the plaintiff was that he was able to understand, remember and carry out simple instructions. His attention and concentration were fair, and he might have some difficulty in a setting with increased demands. The plaintiff was able to follow a schedule and sustain goal directed activity fairly well, but might have problems with quotas. His social skills were adequate. Dr. De Cubas concluded that the plaintiff might need a setting with few demands in order to avoid increased stress, as well as assistance in developing realistic plans. (R:115)

7

On October 21, 2005, Soheil Punjwani, M.D., submitted a three-page Social Security form pertaining to the plaintiff's symptoms. In the first portion of the form, dealing with affective disorders, Dr. Punjwani stated that the plaintiff suffered from disturbance of mood, accompanied by full or partial manic or depressive syndrome, as evidenced by: anhedonia or pervasive loss of interest in almost all activities; psychomotor agitation or retardation; feelings of guilty or worthlessness; difficulty concentrating or thinking; hyperactivity; flight of ideas; inflated self-esteem; decreased need for sleep; easy distractibility, and elevated mood. Dr. Punjwani also opined that the plaintiff suffered from bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes). (R:143)

Based on these symptoms, Dr. Punjwani opined that the plaintiff had marked restrictions of the activities of daily living and difficulties in maintaining social functioning; moderate difficulty in maintaining concentration, persistence or pace, and mild repeated episodes of decompensation. Dr. Punjwani opined that the plaintiff suffered from a residual disease process that has resulted in such marginal adjustment that even a minimal increase

in mental demands or change in the environment would be predicted to cause the plaintiff to decompensate. (R:143-44)

In the second part of the form, dealing with personality disorders, Dr. Punjwani suffered from intense and unstable interpersonal relationships and impulsive and damaging behavior, in addition to episodes of mania. As a result of these symptoms, the plaintiff had marked restrictions of the activities of daily living; extreme difficulties in maintaining social functioning and concentration, persistence or pace, and mild episodes of decompensation. (R:145) No other documents authored by, or pertaining to Dr. Punjwani exist anywhere in the medical record.

At the evidentiary hearing, the plaintiff testified that he was 32 years old, and lived with his wife and two young children. The plaintiff had a driver's license, and had driven to the hearing. The plaintiff had a GED, but stated that he had difficulty comprehending what he was reading. The plaintiff and his children were supported by the plaintiff's wife, who worked as a server at a Denny's restaurant. (R:154-55)

The plaintiff told the ALJ that the longest job he had held was as a waiter at T.G.I. Fridays, but this job lasted for less than a year. The plaintiff then joined the Army, but failed to complete basic training and left after three months. The plaintiff also worked as a mechanic for about one year, working on

9

small engines such as lawnmowers.  He stated that he was fired from that job when he went into one of his depressive states. (R:156-57)

The plaintiff testified that the last time he had worked was in March 2005, when he drove a wrecker.  That job had lasted five or six months.  Once again, the job ended when the plaintiff went into a severe bout of depression and felt that everyone was against him.  He quit the job and did not try to get it back when he came out of the depression because of the manner in which he had quit. (R:158-160)

The plaintiff explained that during his depressive periods, he feels that people are using and abusing or neglecting him.  He stated that he experiences these episodes even though he is constant with his medication.  However, the plaintiff had never been hospitalized in a mental health hospital. (R:160)

The plaintiff testified that he is being treated by Dr. Punjwani, whom he sees once per month.  Dr. Punjwani prescribed Lamictal, Seroquel and Adderall 20 XR.  The plaintiff stated that these drugs were helping to stabilize his mood swings, which were not quite as severe as they had been in the past, but were still present. (R:161)

The plaintiff regularly drove his wife to and from work and drove his neighbor's children to and from school.  After school, the neighbor's children stayed at the plaintiff's house

until their single father returned from work. The plaintiff's two children took the school bus.  The plaintiff helped his wife with the grocery shopping, but his wife prepared the meals and got the children ready for school.  In terms of hobbies, the plaintiff enjoyed fishing. (R:162-65)

The plaintiff testified that his episodes of depression occur every three to four months, and last anywhere from one to four weeks.  During these times, the plaintiff neglected his personal hygiene and did not socialize with anyone.  During times when the plaintiff is not depressed, he was forgetful and lost track of things, but otherwise functioned normally.  The plaintiff also went through manic phases, during which he would do impulsive things such as spending money and things the family could not afford.  During the manic phases, the plaintiff slept intermittently, waking five or six times per night.  The plaintiff stated that he had suffered from these mood swings for as long as he could remember. (R:166-69)

James Michael Ryan, PhD., a vocational expert, testified at the request of the ALJ.  Dr. Ryan testified that the plaintiff's past work as a waiter is classified as being at the light exertional level, unskilled.  His work as a mechanic was at the medium exertional level, semiskilled, with no transferability of skills below medium. (R:170)

11

Dr. Ryan was familiar with GAF scores.  He testified that a score of 70 was at the top of the scale for mild symptoms, and 60 was at the top of the scale for moderate symptoms.  Dr. Ryan added that vocationally speaking, moderate symptoms indicate that an individual may have some conflicts with coworkers, but is capable of working.  (R:170-71)

The ALJ asked Dr. Ryan to assume hypothetically that the plaintiff suffered from moderate symptoms.  Based on that assumption, Dr. Ryan stated that the plaintiff could perform the work of general clerical worker (71,000 in the United States and 500 in Broward County); machine operator (40,000 in the national economy and 250 locally), or inspector (82,000 nationally and 700 locally).  (R:171)

In response to questions posed by counsel for the plaintiff, Dr. Ryan testified that such jobs would be eliminated if this same person had marked restrictions in the activities of daily living, marked difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence and pace.  Likewise, the jobs would be eliminated for a person who had a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.  The jobs would be unavailable to a person who would

12

be forced to not be able to complete his job for a week or two at a time, two or three times per year as a result of emotional limitations. And, finally, the jobs would not be suitable for an individual who suffered from a marked limitation in concentration, persistence and pace and was extremely forgetful and unable to handles skills and tasks.(R:171-72)

## III. DECISION OF THE ALJ

The ALJ first found that the plaintiff met the disability insurance requirements through September 30, 2008; that he had not engaged in substantial gainful activity since his alleged onset date of January 15, 2003, and that he suffered from the severe impairments of an affective disorder with bipolar symptoms and attention deficit hyperactivity disorder. (R:17) After a review of the medical record, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1, Regulations No. 4. (R:17-18)

The ALJ conceded that this finding was inconsistent with the opinion of the plaintiff's treating physician, Dr. Punjwani. However, the ALJ determined that the remaining medical evidence did not support Dr. Punjwani's assessment of the severity of the plaintiff's condition. The ALJ noted that the plaintiff had never required emergency room treatment or hospitalization for depression

13

of ADHD and has not required an increase in his mental health treatment or medication changes because of apparent frequent decompensation episodes.    Additionally, the ALJ found that Dr. Punjwani's opinion that the plaintiff has only experienced 1-2 episodes of decompensation was inconsistent with his finding that the plaintiff decompensates as the result of only minimal changes. Based on these factors, the ALJ gave less weight to the opinion of Dr. Punjwani. (R:18-19)

Next, the ALJ found that the plaintiff retained the residual functional capacity to perform the exertional and non-exertional requirements of all work not requiring more than simple 1-2 step work tasks.  After considering the documentary evidence of the plaintiff's symptoms as well as the opinion evidence, the ALJ found that the plaintiff's medically determinable impairment could reasonably be expected to produced the symptoms alleged by the plaintiff, but that the plaintiff's testimony concerning the intensity, duration and limiting effects of these symptoms was not entirely credible. (R:19)

Regarding the opinion evidence, the ALJ gave less weight to the opinion of Dr. Punjwani, but did credit the opinions of the state agency physicians that the plaintiff was mildly limited in his social functioning and activities of daily living; moderately limited in his ability to maintain concentration, persistence and

14

pace and has not experienced episodes of decompensation. The ALJ noted that the plaintiff was able to leave his home to shop and attend appointments, perform household chores, cook meals and maintain a good relationship with his family, all of which indicated that the plaintiff did not experience decompensation with minimal change. Moreover, these activities demonstrated the plaintiff's ability to follow a routine and perform daily activities at an acceptable level, and to interact with immediate family members, medical professionals and the general public without incident. (R:19)

The ALJ found that the plaintiff did have difficulty concentrating and remembering, and that he relied on his wife to pay bills and remind him of grocery store items, which is consistent with an individual who is moderately limited in his ability to maintain concentration, persistence and pace. The ALJ reiterated that the plaintiff has not required frequent changes to his mental health therapy regimen, nor has he needed frequent changes in medication. Additionally, the plaintiff's current treatment did not cause side effects and its lack of change indicated that the treatment was effective in controlling the plaintiff's symptoms. (R:19)

Next, the ALJ found that the plaintiff could not perform his past relevant work as a mechanic and waiter because these jobs

involve more than simple, unskilled type work tasks.  In determining whether a successful adjustment to other work could be made, the ALJ considered the plaintiff's age (a younger individual on the alleged disability onset date) and education (high school education with the ability to speak English).  Transferability of job skills was not material to the disability determination because of the plaintiff's age.  Based on the testimony of the vocational expert that there were jobs which existed in significant numbers in the national and local economies which the plaintiff could perform, the ALJ found that the plaintiff was not disabled. (R:19-20)

## IV. CROSS MOTIONS FOR SUMMARY JUDGMENT

The plaintiff seeks reversal or remand on three grounds. First he contends that the ALJ's residual functional capacity assessment was not based on substantial evidence because the ALJ rejected the opinion of Dr. De Cubas or the opinion of any physician of record.  The plaintiff also argues that the ALJ erred in his evaluation of the plaintiff's subjective complaints.  Finally, the plaintiff asserts that the ALJ failed to sustain his burden of proof that there is other work that the plaintiff can perform.

The Commissioner argues that the ALJ's decision should be affirmed because it was supported by substantial evidence and the correct legal standards were applied.

16

V. RECOMMENDATIONS OF LAW

At issue before the Court is whether the final decision of the Commissioner, as reflected by the record, is supported by substantial evidence. "Even if the evidence preponderates against the Secretary, we must affirm if the decision is supported by substantial evidence." Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1985). Substantial evidence is defined as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389 (1971); Bloodsworth v. Heckler, 703 F.2d 1233 (11th Cir. 1983). The Court must review the record as a whole to determine if the decision is supported by substantial evidence. Bloodsworth, 703 F.2d at 1239. The Court must also determine whether the Administrative Law Judge applied the proper legal standards. No presumption of validity attaches to the Commissioner's determination of the proper legal standards to be applied. Richardson, supra.

In making a disability determination, the ALJ must perform the sequential evaluation outlined in 20 CFR § 404.1520. First the claimant must not be engaged in substantial gainful activity after the date the disability began. Second the claimant must provide evidence of a severe impairment. Third, the claimant must show that the impairment meets or equals an impairment in Appendix 1 of the Regulations. If the claimant fails to provide sufficient evidence

17

to accomplish step three, the analysis proceeds to step four.  In step four, the ALJ must determine the claimant's residual functional capacity, then determine if the claimant can perform his or her past relevant work.  The claimant has the burden of proving the inability to perform past relevant work. If the claimant's evidence shows an inability to perform past relevant work, the burden shifts to the ALJ in step five.  The ALJ must show that there is other gainful work in the national economy which the claimant can perform.  Once the ALJ identifies such work, the burden returns to the claimant to prove his or her inability to  perform such work.

The plaintiff first asserts that the ALJ's residual functional capacity assessment was not based on substantial evidence.  In evaluating mental impairments, the ALJ must follow a four-step procedure outlined in 20 C.F.R. § 404.1520(b).  First, the ALJ must record the pertinent signs, symptoms, finding, functional limitations and effects of treatment evidenced in the case record. Second, if the ALJ determines that a mental impairment exists, he or she must indicate whether certain medical findings which have been found especially relevant to the ability to work are present or absent.  Next, the ALJ must rate the degree of functional loss from the impairment in the activities of daily living; social functioning; concentration, persistence or pace, and deterioration or decompensation in work or work-like settings.  Finally, if the

18

mental impairment is determined to be severe, the ALJ must determine whether it meets or equals a listed mental disorder; if it does not, the ALJ a mental residual functional capacity assessment must be done.

In the instant case, the ALJ followed these steps in arriving at his determination of the plaintiff's residual functional capacity. In reaching his decision, the ALJ gave greater weight to the opinions of the non-examining state agency psychologists because there was virtually no evidence in the record to support the conclusory opinion of the plaintiff's treating physician, Dr. Punjwani. The first agency psychologist, Dr. Figueredo, found that the plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace and no episodes of decompensation. Dr. Figueredo concluded that the plaintiff's impairments were "not severe" for purposes of disability determination.

The second state agency psychologist, Dr. De Cubas, found that the plaintiff was able to understand, remember and carry out simple instructions. His attention and concentration were fair, and he might have some difficulty in a setting with increased demands. The plaintiff was able to follow a schedule and sustain goal directed activity fairly well, but might have problems with quotas.

His social skills were adequate.  Dr. De Cubas concluded that the plaintiff might need a setting with few demands in order to avoid increased stress, as well as assistance in developing realistic plans.

The ALJ's conclusion that the plaintiff retained the residual functional capacity to perform the exertional and non-exertional requirements of all work not requiring more than simple 1-2 step work tasks was consistent with the opinions of the two state agency psychologists and with the record as a whole.  It was, therefore, supported by substantial evidence and should not be disturbed.

Next, the plaintiff argues that the ALJ erred in finding that his subjective complaints were not fully credible.  The ALJ must consider a claimant's subjective testimony regarding pain if he finds evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain.  Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992); Mason v. Bowen, 791 F.2d 1460, 1462 (11th Cir. 1986); Landry v. Heckler, 734 F.2d 1551, 1553 (11th Cir. 1986).  However, the ALJ may reject a claimant's testimony regarding pain as not credible, and that determination must be

20

upheld if it is supported by substantial evidence. <u>Wilson v.
Heckler</u>, 734 F.2d 513, 517 (11th Cir. 1984). This standard also
applies to subjective conditions other than pain. <u>Holt v. Sullivan</u>,
921 F.2d 1221, 1223 (11th Cir. 1992), citing <u>Jackson v. Brown</u>, 873
F. 2d 1111, 1114 (11th Cir. 1989).

In the instant case, the ALJ found that the plaintiff's
mental impairment could be expected to give rise to the symptoms the
plaintiff alleged, but the plaintiff's testimony concerning the
intensity, duration and limiting effects of these symptoms was not
entirely credible.  In making this determination, the ALJ The ALJ
emphasized that the plaintiff was able to leave his home to shop and
attend appointments, perform household chores, cook meals and
maintain a good relationship with his family.  The ALJ concluded
that these activities demonstrated the plaintiff's ability to follow
a routine and perform daily activities at an acceptable level, and
to interact with immediate family members, medical professionals and
the general public without incident.

The ALJ also pointed out that the plaintiff has not
required frequent changes to his mental health therapy regimen, nor
has he needed frequent changes in medication.  Additionally, the
plaintiff's current treatment did not cause side effects.  Based on
the fact that there had been few changes in the treatment, it
appeared to be effective in controlling the plaintiff's symptoms.

In light of these factors, the ALJ's finding that the plaintiff had exaggerated the severity and frequency of his moods was justified and should not be overturned.

Finally, the plaintiff argues that the ALJ failed to sustain his burden of proving that there is other work in the national economy that the plaintiff can perform. Where a claimant has a non-exertional impairment that significantly limits his basic work skills, or the claimant cannot perform a full range of employment at the appropriate level of exertion, the ALJ may use the Medical Vocational Guidelines (Grids) as a framework to evaluate vocational factors, but also must introduce independent evidence, preferably through a vocational expert's testimony, of the existence of jobs in the national economy that the plaintiff can perform. Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Welch v. Bowen, 854 F.2d 436, 439-40 (11th Cir. 1988).

In the instant case, the ALJ did elicit testimony from a vocational expert, Dr. Ryan. He presented to Dr. Ryan a hypothetical in which an individual of the plaintiff's age and work experience had a GAF of 60, indicating moderate symptoms. This hypothetical clearly afforded the plaintiff the benefit of the doubt, since his most recent GAF score was 70, the top of the scale for mild symptoms. Additionally, the state agency psychologists found that the plaintiff had moderate limitations in only a few

areas.  Under these circumstances, the answer provided by Dr. Ryan
was  a  conservative  one,  and  supported  by  medical  and  opinion
evidence in the record.

        While there is evidence in the record to support the
plaintiff's claim of disability, the medical record is sketchy, at
best.   Moreover, this court may not re-weigh that evidence or
substitute its judgment for that of the ALJ.  <u>Wolfe v. Chater</u>, 86
F.3d 1072, 1076 (11th Cir. 1996); <u>Foote v. Chater</u>, 67 F.3d 1050,
1053 (11th Cir. 1995).  Based on a careful review of the record, the
undersigned finds that the decision of the ALJ to deny disability
benefits was supported by substantial evidence and that the correct
legal standards were applied.

### VI. CONCLUSION

        This Court having considered carefully the pleadings,
arguments of counsel, and the applicable case law, it is hereby

        RECOMMENDED that the plaintiff's Motion for Judgment on
the Pleadings be DENIED, and the Commissioner's Motion for Summary
Judgment be GRANTED.

        The parties will have ten days from the date of being
served with a copy of this Report and Recommendation within which
to  file  written  objections,  if  any,  for  consideration  by  The
Honorable James I. Cohn, United States District Judge.  Failure to
file objections timely shall bar the parties from attacking on

23

appeal factual findings contained herein. LoConte v. Dugger, 847

F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988); RTC

v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

    DONE AND SUBMITTED at Fort Lauderdale, Florida, this 18th

day of September, 2007.


                                    LURANA S. SNOW
                                    UNITED STATES MAGISTRATE JUDGE


Copies to:

Adam Scott Neidenberg, Esq. (P)
AUSA David I. Mellinger (FTL)(D)